GEOFFREY L. KENNEDY,                    )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )    No.  4:10CV1436 FRB
                                        )
AETNA LIFE INSURANCE COMPANY,           )
et al.,                                 )
                                        )
                    Defendants.         )

## MEMORANDUM AND ORDER

Presently pending before the Court are the parties' cross-motions for summary judgment.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

Plaintiff brings this cause of action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, et seq., alleging that his employer, defendant Countrywide Financial Corporation, and the administrator of its employee benefit plan, defendant Aetna Life Insurance Company, wrongfully terminated his short term disability benefits to which he was entitled under the plan.  Plaintiff also alleges that defendants' wrongful termination of his short term disability benefits precluded him from applying for and receiving long term disability benefits, to which he claims he was also entitled.  Plaintiff seeks recovery of short term disability benefits for the remainder of the period during which he claims he was eligible for such benefits,

recovery of long term disability benefits from the date upon which he claims he would have otherwise been eligible to receive such benefits, and recovery of his attorney's fees and costs incurred in this action.

Plaintiff and defendants now move for summary judgment, arguing that there are no genuine issues of material fact and that they are each entitled to judgment as a matter of law. The parties have responded to their opponent's motion, to which each have replied.

Pursuant to Fed. R. Civ. P. 56(c), a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). The burden of proof is on the moving party to set forth the basis of its motion, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. <u>Id.</u> The non-moving party may not rest upon its pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. <u>Celotex</u>, 477 U.S. at 324.

"[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983). Instead, each summary judgment motion must be evaluated separately on its own merits to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law. Husinga v. Federal-Mogul Ignition Co., 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007).

## I. General Background

Defendant Aetna Life Insurance Company (Aetna) is an administrator and the insurer of defendant Countrywide Financial Corporation's (Countrywide's) short term disability plan (STD Plan) and long term disability plan (LTD Plan), governed by ERISA. The Plan(s) give Aetna, as administrator, discretionary authority to determine whether and to what extent employees and beneficiaries are entitled to benefits; and further provide that Aetna, as insurer, will pay the claims. Effective June 6, 2008, plaintiff Geoffrey L. Kennedy, a Countrywide employee, was granted an initial period of short term disability benefits under the STD Plan following a diagnosis of Parkinson's disease. Aetna subsequently determined the medical evidence not to establish a functional impairment sufficient to preclude plaintiff's performance of the

material duties of his employment with Countrywide and terminated plaintiff's short term disability benefits effective September 25, 2008. Plaintiff administratively appealed this determination. On November 13, 2009, after consideration of additional evidence, Aetna affirmed its previous decision to terminate benefits.

In the meanwhile, Aetna informed plaintiff on June 11, 2009, that he was not eligible to receive long term disability benefits under the LTD Plan and that his claim for such benefits was closed.

Plaintiff filed the instant cause of action in this Court on August 6, 2010, challenging defendants' termination of his short term disability benefits, the denial of long term disability benefits, and the processes used in such determinations.

## II. Evidence Before the Court on the Motions

In determining the instant motions for summary judgment, the Court has reviewed the evidence and information submitted in support of the parties' respective positions and finds there to be no genuine issues of material fact in dispute.[1]  A recitation of

---

[1]Specifically, the Court has reviewed and considered the exhibits and information submitted in support of defendants' Statement of Uncontroverted Material Facts (Doc. #41, Doc. #41(1-6), Doc. ##44-50), and in support of plaintiff's Statement of Uncontroverted Material Facts (Doc. #51-1, Doc. #55, Doc. #55(1-25)).  The Court also reviewed and considered the affidavit of plaintiff Geoffrey L. Kennedy (Doc. #56-1), as well as defendants' exhibits submitted in support of their reply brief (Doc. #59(1-2)). Although the Court reviewed such evidence and exhibits in their entirety, specific reference is made only to certain of those exhibits when necessitated by the discussion.

the relevant undisputed facts follows:

As is relevant to this cause of action, plaintiff was employed by defendant Countrywide as a level III underwriter and was employed in this position on June 5, 2008, the last day he worked at Countrywide. Shortly after his last day at Countrywide, plaintiff applied for short term disability benefits under Countrywide's STD Plan on account of his recent diagnosis of Parkinson's disease.

To be disabled under Countrywide's STD Plan, an employee must be unable "to perform the material duties of [his] own occupation" "solely because of disease or injury[.]" (Doc. #41-4, p. 2.) "Material duties" are those "normally required for the performance of [the employee's] own occupation; and cannot be reasonably omitted or modified." (<u>Id.</u> at p. 13.) An employee's "own occupation" is that which the employee is "routinely performing when [his] period of disability begins[,] . . . viewed as it is normally performed in the national economy instead of how it is performed: for [the employee's] specific employer; or at [the employee's] location or work site[.]" (<u>Id.</u>) Payment of short term disability benefits begins after an "elimination period" ends, that is, after a defined period within which an employee is continuously disabled under the Plan. If Aetna finds an employee no longer disabled under the Plan, the employee's period of disability ends on the date of such finding. (<u>Id.</u> at p. 3.)

A.    Initial Grant and Subsequent Termination of STD Benefits

On April 16, 2008, prior to his departure from Countrywide, plaintiff visited neurologist Dr. Todd B. Silverman and reported a twelve-month history of decreased facial expression, mildly slurred speech, slower movements, difficulty initiating movement, increased saliva, occasional drooling, and left hand tremor. Plaintiff reported that he moved papers more slowly when working at his desk. Review of systems showed plaintiff not to experience any alteration in his level of consciousness, memory or intellectual abilities. Plaintiff did not experience fatiguing weakness or excessive daytime sleepiness, but reported easy fatigue. Plaintiff experienced no sensory loss or difficulty with receptive or expressive language function. Mental status, sensory and cranial nerve examinations yielded normal results. Motor examination showed plaintiff to be "quite bradykinetic" with diminished facial expression and blink rate. No tremor or other involuntary movements were seen. Plaintiff's gait was mildly altered. Dr. Silverman concluded that plaintiff likely suffered idiopathic Parkinson's disease but noted plaintiff's cognition to appear normal. An MRI was ordered and plaintiff was given carbidopa/levodopa (Sinemet). (Doc. #55-3, pp. 1-3.)

On May 20, 2008, plaintiff reported to Dr. Silverman that he noticed a significant improvement in his ability to walk, move and speak while taking his medication. Plaintiff reported some

cognitive slowing and reported that he felt he was not moving fast enough to keep up with the demands at work.  Plaintiff reported to Dr. Silverman that he was considering applying for disability.  Dr. Silverman noted plaintiff's laboratory tests to yield normal results.  An MRI of the brain obtained on May 7, 2008, showed mild age-related changes with no acute lesions.  Physical examination showed plaintiff to be fully alert and oriented, with fluent speech and normal comprehension, repetition and naming.  Dr. Silverman noted plaintiff's speech to be a bit quicker than during his previous examination.  Plaintiff's gait was noted to be "clearly more spry."  Dr. Silverman diagnosed plaintiff with idiopathic Parkinson's disease and determined to continue plaintiff on Sinemet given his response to the medication.  Plaintiff's dosage of Sinemet was increased.  Plaintiff was instructed to return in one month.  (Doc. #55-3, pp. 4, 5.)

In a Health Care Provider Certification form completed for Countrywide on June 8, 2008, Dr. Silverman reported that plaintiff's chronic medical condition commenced on April 16, 2007, and was of an ongoing nature.  Dr. Silverman reported that plaintiff's condition required him to be off of work beginning May 20, 2008, with an unknown return date.  Dr. Silverman opined that plaintiff could not perform work of any kind.  (Doc. #55-3, pp. 11-13.)

On June 13, 2008, plaintiff applied to Aetna for

temporary disability benefits under Countrywide's STD Plan.  (Doc. #45, p. 8.)

In support of his application for benefits, plaintiff submitted to Aetna an Attending Physician Statement (APS) completed by Dr. Silverman on June 18, 2008.  It was noted in the APS that plaintiff was most recently treated by Dr. Silverman on May 20, 2008.  In the APS, Dr. Silverman reported that plaintiff had been diagnosed with Parkinson's disease with objective findings thereof to include bradykinesia, rigidity, unsteady gait, and cognitive slowing.  Dr. Silverman reported plaintiff's symptoms of the disease to have first appeared on April 16, 2007, and that plaintiff was first treated for the condition on April 16, 2008. Dr. Silverman noted that treatment of the disease consisted of medications, including Sinemet, vitamin E and vitamin C.  Dr. Silverman reported that plaintiff was restricted in "anything requiring mental speed or physical agility" and was impaired in that his cognition was slow and he had great difficulty multi-tasking.  Dr. Silverman opined that plaintiff's condition caused marked limitation in functional capacity as well as marked limitation in his mental capacity in that he was unable to engage in stress or interpersonal relationships.  Dr. Silverman concluded that Parkinson's disease prevented plaintiff from keeping up with the demands of his job.  (Doc. #55-3, pp. 14-16.)

On June 27, 2008, Aetna determined plaintiff to be

eligible for benefits under the STD Plan, finding plaintiff to be disabled since June 6, 2008. Because the Plan required a sixty-day elimination period before payment of short term disability benefits, plaintiff was advised that payment of such benefits would begin on August 5, 2008. Aetna informed plaintiff that eligibility for benefits would not be considered beyond August 5, 2008, unless additional medical information was received demonstrating his inability to return to work at that time. (Doc. #44, pp. 68-69.)

In support of his continued request for short term disability benefits, plaintiff submitted to Aetna treatment notes from Dr. Silverman dated July 7, 2008, which showed plaintiff to report that he felt the Sinemet to be working. Plaintiff reported that he felt "shaky" if he delayed taking his medication. Plaintiff reported to Dr. Silverman that he was now retired, had been approved for short term disability benefits, and was applying for long term benefits. Examination showed plaintiff to be awake, alert, oriented, and to have normal speech. Plaintiff had normal fine-finger movements, and examination of the cranial nerves yielded normal results. Sensory examination was normal. Dr. Silverman noted there to be mild bradykinetion. Dr. Silverman concluded that plaintiff exhibited good response to Sinemet and instructed plaintiff to return in three months. (Doc. #55-2, p. 50.)

On August 8, 2008, Aetna informed plaintiff that, upon

review of additional information received from plaintiff's attending physician, Aetna determined to extend plaintiff's period of temporary disability to September 4, 2008. Aetna informed plaintiff that if he remained disabled beyond September 4, additional information from plaintiff's attending physician would be required and would need to demonstrate a "clear understanding of how [his] disability continue[d] to affect [his] work capacity." (Doc. #44, pp. 62-63.)

Plaintiff submitted an APS to Aetna dated September 11, 2008, completed by internist Dr. Guy W. Aton. Dr. Aton noted plaintiff's last office visit with him to be July 11, 2008. In the APS, Dr. Aton reported that plaintiff had been diagnosed with Parkinson's disease and that he was being treated for the condition with Sinemet. Dr. Aton reported that plaintiff exhibited symptoms of weakness and tremor. Dr. Aton opined that plaintiff had no ability to work in that he suffered severe limitations in functional capacity. Dr. Aton reported that plaintiff was capable of working no more than one hour a day, that plaintiff would experience such restriction "forever," and that plaintiff could "never" return to work. Dr. Aton reported that plaintiff was motivated to return to work, but that his condition had regressed. (Doc. #55-2, pp. 44-46.)[2]

---

[2]An undated APS with Dr. Aton's signature sets out the same conclusions as the September 11, 2008, APS, that is, that plaintiff was unable to work on account of restrictions caused by his disease. A facsimile date of "09-24-08" is stamped at the top of

Aetna thereafter determined to extend plaintiff's period of disability to September 24, 2008, so that it could undertake a peer review to confirm further neurological progression of the disease, assess plaintiff's cognition abilities and disease progression, and to prepare for probable transition to long term disability. (Doc. #45, p. 27.)

On September 19, 2008, a medical consultant with Aetna, neurologist Dr. Henry Spira, conducted a peer-to-peer conference with Dr. Silverman. In his written review, Dr. Spira reported that during this peer-to-peer conference, Dr. Silverman stated

> that the claimant describes slowing of cognition and could not perform the essential duties of his job as he used to. He described difficulty keeping up with the pace required of his job. Dr. Silverman stated that the claimant had early stage Parkinsonism, idiopathic, and had a good response to Sinemet. He could not describe anything clinical on examination that would preclude the claimant from working in his own occupation and planned to do psychometric neuro-psych testing.

(Doc. #47, p. 10.)

In addition to participating in this peer-to-peer conference with Dr. Silverman, Dr. Spira reviewed the following medical records:

* APS dated September 11, 2008, from Dr. Aton;

* APS not dated with illegible signature;

---

each page of this otherwise undated APS. (Doc. #55-2, pp. 35-37.)

* new patient consultation dated April 16, 2008, from Dr. Silverman;

* patient visit dated May 20, 2008, from Dr. Silverman;

* office note dated July 7, 2008, from Dr. Silverman;

* MRI brain dated May 7, 2008;

* lab results;

* medical history questionnaire dated April 16, 2008; and

* Countrywide Health Care Provider Certification and APS dated June 18, 2008.

(See Doc. #47, pp. 9-10.)

Based upon his review of this documentation and his conference with Dr. Silverman, Dr. Spira opined that the evidence failed to support a finding of functional impairment for the entire period of June 6, 2008, to December 2, 2008. Dr. Spira specifically found that "[a]lthough the claimant described cognitive dysfunction, he had a normal mental status examination." (Id. at 11.) Dr. Spira also noted that medication improved plaintiff's condition. (Id.) Finally, Dr. Spira opined that, "[f]rom a neurological standpoint, the restrictions and limitations, based on the provided data, are not appropriate." (Id.)

In the meanwhile, Dr. Silverman completed another APS, dated September 19, 2008. Dr. Silverman noted his last examination of plaintiff occurred on July 7, 2008, and that plaintiff was next scheduled for an appointment in October 2008. In the APS, Dr. Silverman opined that plaintiff's Parkinson's disease prevented him

from keeping up with the pace and stress of his job as a loan underwriter. Dr. Silverman reported plaintiff to exhibit symptoms of tremor, slurred speech and slowing motor function, and that objective findings of plaintiff's impairment included bradykinesia, rigidity and unsteady gait. Dr. Silverman noted plaintiff's condition to have stabilized. Dr. Silverman reported that plaintiff was not motivated to return to work at his previous job. (Doc. #55-2, pp. 38-40.)

In a letter dated September 30, 2008, Aetna informed plaintiff that, based on review of the clinical data and the peer-to-peer conference with Dr. Silverman, it had determined that the clinical information failed to support a finding that plaintiff was functionally impaired from performing his job duties and that, therefore, plaintiff was not totally disabled from performing his job as an underwriter with Countrywide. Aetna informed plaintiff that it was terminating his claim for short term disability benefits for the period after September 24, 2008, and advised plaintiff of the process by which to seek review of this determination. (Doc. #44, pp. 55-56.)

B.  Appeal of Initial Determination

In a letter dated March 18, 2009, plaintiff, through counsel, appealed Aetna's denial of plaintiff's claim for short term disability benefits. (Doc. #46, pp. 45-52.)

Subsequent to Aetna's initial determination to terminate

benefits, but prior to plaintiff's appeal of this determination, plaintiff underwent a neuropsychological evaluation upon referral from Dr. Silverman. (Doc. #47, pp. 15-19.) Specifically, on October 1, 2008, neuropsychologist Nicole Schwarze evaluated plaintiff during which plaintiff reported that he experienced slowed processing speed, mild memory problems, occasional slurred speech, and worsening cognitive problems. Plaintiff reported having no problems with reasoning, language comprehension and expression, or problem solving. Behavioral observations showed plaintiff not to have any physical limitations that interfered with his performance. Plaintiff's speech was noted to be fluent and articulate without errors or abnormalities. Plaintiff's thought processes were noted to be well organized and goal directed. Plaintiff's affect was appropriate, but he seemed mildly anxious and fidgeted throughout the appointment. Dr. Schwarze noted plaintiff to be attentive and alert throughout the long test session (three hours), and plaintiff was observed to understand test directions easily. During the evaluation, Dr. Schwarze administered the following tests: Trail Making Test Part A and B, Delis-Kaplan Executive Functioning System, Boston Naming Test, Benton Visual Form Discrimination Test, Wechsler Memory Scale 3rd Edition, California Verbal Learning Test 2nd Edition, Brief Visuospatial Memory Test Revised, Wechsler Adult Intelligence Scale 3rd Edition, Wisconsin Card Sorting Test, Wechsler Test of Adult

Reading, Beck Depression Inventory 2nd Edition, and Beck Anxiety Inventory.  Upon conclusion of the evaluation and testing, Dr. Schwarze reported the results to show

> mild deficits in some visuospatial abilities such as visual attention and visuomotor construction as well as a minimal deficit in verbal recognition memory.  His cognition is otherwise intact including intact performance on tests assessing auditory attention, verbal expression, visual memory, most tests assessing verbal memory, information processing speed, and executive functioning. Emotionally, he denies clinically significant symptoms of depression or anxiety.  The mild deficits observed on this evaluation are nonspecific but are likely related to probable idiopathic Parkinson's disease given his otherwise unremarkable medical history and that these types of cognitive deficits are sometimes observed in those with idiopathic Parkinson's disease.
>
> Although the mild deficits observed on this evaluation do not necessarily preclude Mr. Kennedy from working, he reports remarkable problems with stamina and fatigue that may interfere with his ability to work.  I defer to Dr. Silverman regarding Mr. Kennedy's ability to work at this point.

(Doc. #47, p. 18.)

Dr. Schwarze provided a copy of the neuropsychological report to Dr. Silverman and to Dr. Aton (id.), and the report was considered by Aetna on plaintiff's administrative appeal (Doc. #46, p. 30; Doc. #48, p. 19).

On March 26, 2009, at the request of plaintiff's counsel, plaintiff underwent a psychological and vocational rehabilitation

- 15 -

evaluation by psychologist Vincent F. Stock. Plaintiff reported to Dr. Stock that he currently was unable to maintain a full-time employment position because he drools, needs to nap, gets dizzy, lives with constant pain, has a problem expressing himself in his thoughts, gets nervous, shakes, and slurs his words. Plaintiff also reported that he loses focus, gets groggy in the afternoon, experiences a loss of motor skills, can stand for only forty-five minutes, and can sit for only one hour before needing to change position. Dr. Stock reviewed medical evidence consisting of Dr. Silverman's records dated April 16 through July 7, 2008; Dr. Silverman's medical note dated November 12, 2008; and Dr. Aton's APS dated September 24, 2008.[3] Dr. Stock also reviewed a letter to plaintiff from Countrywide dated September 19, 2008, terminating plaintiff's employment on account of his permanent disability[4]; a letter dated December 22, 2008, from Daniel F. Cunningham, a former co-worker of plaintiff's; a job description of Underwriter III/Countrywide Financial dated January 16, 2009; and plaintiff's letter of appeal to Aetna dated March 18, 2009. Dr. Stock conducted a mental status examination which showed plaintiff to be cooperative and thorough in his explanation of the situation. Plaintiff was calm and anxious with intact thought processes.

---

[3]See n.2, supra.

[4]The letter states that plaintiff advised Countrywide that he was not able to return to work due to his permanent disability. (Doc. #55-2, p. 27.)

Plaintiff was fully oriented and took his time answering questions. General knowledge was intact as well as simple calculations. Dr. Stock noted plaintiff to be impaired in serial sevens and serial threes. Abstract capability, judgment and insight were noted to be intact. Plaintiff reported that he experienced feelings of depression and that he had trouble with his memory. Based upon his review of the medical evidence and his interview with plaintiff, Dr. Stock concluded that plaintiff had a significant interference and impediment to employment, that there were no jobs available for plaintiff to perform, and that plaintiff should be considered permanently and totally disabled. Dr. Stock diagnosed plaintiff with generalized anxiety disorder and assigned a Global Assessment of Functioning (GAF) score of 45.[5]  (Doc. #55-1, pp. 28-35.)

Plaintiff submitted Dr. Stock's evaluation, Countrywide's September 2008 letter and Mr. Cunningham's December 2008 letter to Aetna for consideration on administrative appeal. Plaintiff also submitted to Aetna an e-mail dated December 3, 2008, from Countrywide Human Resources detailing the job description of underwriter III.

---

[5]The undersigned takes judicial notice of the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, Text Revision (4th ed. 2000) (DSM-IV-TR), which describes a Global Assessment of Functioning (GAF) score as a consideration of "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." <u>Id.</u> at 34. A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). <u>Id.</u>

On April 30, 2009, Dr. Aton completed an APS in which he stated that plaintiff's Parkinson's disease caused him to be absent from work due to disability beginning in June 2008, and that such disability would never end.[6] Dr. Aton reported that plaintiff took medication for the condition. Dr. Aton reported plaintiff to experience symptoms of progressive weakness and tremors, and that plaintiff had no ability to work. Dr. Aton opined that plaintiff could work only one day a week and for one hour, at most. Dr. Aton opined that plaintiff could never return to work and that a "simple physical exam" provided objective findings supporting this conclusion. Dr. Aton reported that plaintiff's condition had both stabilized and regressed, and that plaintiff was motivated to return to work. (Doc. #55-1, pp. 13-15.)

In a Capabilities and Limitations Worksheet completed that same date, April 30, 2009, Dr. Aton reported that plaintiff could occasionally pull, push, carry, stand, stoop, and walk; but could never climb, crawl, kneel, lift, reach, bend, twist, grasp, manipulate, or engage in repetitive motion. Dr. Aton further reported that plaintiff could occasionally lift up to twenty pounds. Dr. Aton reported that plaintiff could not engage in frequent flexing or rotation of the head and neck, nor allow his head and neck to remain in static position. Plaintiff had no environmental limitations nor any limitations in his speech, vision

---

[6]It was not noted in this APS when plaintiff last visited Dr. Aton.

or hearing.  Dr. Aton opined that plaintiff could work a total of two hours a day, at most, and that plaintiff would be so restricted "forever."  (Doc. #55-1, p. 16.)

Plaintiff submitted Dr. Aton's April 2009 APS and Capabilities and Limitations Worksheet to Aetna for consideration on administrative appeal.

Plaintiff visited Dr. Lee Tempel on June 22, 2009, who noted plaintiff's diagnosis of Parkinson's disease.  Plaintiff reported to Dr. Tempel that he experienced tremors, slower walking, shuffling, and stooping for many months and was then diagnosed with Parkinson's in June 2008.  Plaintiff reported that he was given medication for the condition from which he obtained benefit unless he was stressed.  Plaintiff reported that if he missed a dose of his medication or was stressed, he experienced increased freezing/festination, disorientation, lack of focus, anxiety, and slurring of words.  Plaintiff reported not experiencing these symptoms often if he is at home, relaxed, and able to take naps after exerting himself.  Plaintiff reported that he was under a lot of stress while at work, and that he had slowed down and could not focus. Mental status examination showed plaintiff to be oriented, to have intact language with mild to moderately soft monotone, and to have intact attention and memory.  Plaintiff's affect was noted to be okay.  Physical examination showed mild rigidity of the upper and lower extremities, with mild generalized bradykinesia.  Plaintiff

had full strength in all extremities. Rapid finger tap was mildly slow with poor coordination. No tremors were noted at rest or with action, but minimal tremor was noted with outstretched fingers. Dr. Tempel noted plaintiff's steps to be mildly small and to be slow, but not shuffling. Plaintiff had a mild stoop and a mild limp. Rising to a standing position was moderately difficult and minimal postural instability was noted. Dr. Tempel concluded that plaintiff had typical features of idiopathic Parkinson's disease, including gross and fine motor signs of bradykinesia, rigidity, parkinsonian gait, and balance changes. Dr. Tempel reported that plaintiff had some cognitive slowing, inability to multi-task, and inability to maintain focus over sustained periods that worsened with stress and time constraints. Dr. Tempel reported that such "non motor" problems associated with Parkinson's did not respond well to medications prescribed for the disease. Dr. Tempel opined that plaintiff was undertreated. Dr. Tempel determined for plaintiff to discontinue Sinemet and to start Stalevo. Plaintiff was instructed to begin a home exercise program. Dr. Tempel noted that he reviewed Dr. Stock's March 2009 evaluation and agreed with the conclusions therein, including that plaintiff was unable to maintain competitive employment at his last occupation or in any similar occupation. (Doc. #55, pp. 4-7.)

Plaintiff submitted Dr. Tempel's treatment notes to Aetna for consideration on administrative appeal.

In a letter dated July 30, 2009, plaintiff, through counsel, informed Aetna that he had submitted all evidence he intended to submit on the appeal. (Doc. #47, pp. 52-53.)

On September 14, 2009, psychologist Lawrence Burstein, a consultant with Aetna, completed a Physician Review in which he opined that evidence failed to support a finding of functional impairment for the entire period from September 25, 2008, through the date of his opinion. (Doc. #46, pp. 60-64.) In rendering this opinion, Dr. Burstein reviewed the following evidence:

* Job description

* New Patient Consultation report from Dr. Silverman, Neurology, dated April 16, 2008;

* Neurosurgery and Neurology, LLC, Medical History Questionnaire, signed by plaintiff, dated April 16, 2008;

* Laboratory report from St. Luke's Hospital, dated April 16, 2008;

* MRI brain with and without contrast report from St. Luke's Center for Diagnostic Imaging, dated May 7, 2008;

* Neurological follow-up report from Dr. Silverman, dated May 20, 2008;

* Health Care Provider Certification form, signed by Dr. Silverman, dated June 8, 2008;

* Office visit report from Dr. Silverman, dated July 7, 2008;

* APS signed by Dr. Silverman, dated June 18, 2008;

* Authorization for Aetna to Request Protected Health Information Necessary to Process a Disability Claim forms, signed by plaintiff, both dated June 23, 2008;

\*     APS signed by plaintiff, dated July 11, 2008, physician signature illegible;

\*     APS's signed by Dr. Guy W. Aton, Internal Medicine, dated September 11, 2008, and September 18, 2008;

\*     APS signed by Dr. Silverman, dated September 19, 2008;

\*     Letter addressed to claimant from Andrea Smith, AVP, Leave of Absence, Countrywide Human Resources, dated September 19, 2008;

\*     Copy of a prior peer review report completed by Dr. Henry Spira, Neurology, dated September 22, 2008;

\*     Copy of the STD claim determination letter, dated September 30, 2008;

\*     Letter from claimant, dated December 2, 2008;

\*     "To Whom It May Concern" letter from Daniel F. Cunningham, dated December 22, 2008;

\*     Letter from claimant, dated January 25, 2009;

\*     Appeal request letter of representation from Phillip A. Tatlow, Esquire, dated March 18, 2009;

\*     Report of Psychological and Vocational Rehabilitation Evaluation from Vincent F. Stock, M.A., Licensed Psychologist, dated March 26, 2009;

\*     Social Security Administration Consent for Release of Information form, Aetna Reimbursement Agreement (LTD) form, signed by plaintiff, both dated March 29, 2009;

\*     Letter from Attorney Tatlow, dated April 15, 2009;

\*     APS, Capabilities and Limitations Worksheet, signed by Dr. Aton, both dated April 30, 2009;

\*     Work History and Education Questionnaire, signed by plaintiff, dated May 21, 2009;

\*     Authorization for Aetna to Request Protected Health Information Necessary to Process a Disability Claim form, Authorization to Obtain Information form, signed by plaintiff, both dated May 25, 2009;

* Aetna Other Income Questionnaire Disability Benefits, signed by plaintiff, dated May 26, 2009;

* Medical Report from Lee W. Tempel, M.D., Neurology, dated June 22, 2009;

* List of Symptoms for claimant, update, dated June 22, 2009; and

* Correspondence from Attorney Tatlow, dated July 1 and July 30, 2009.

(See Doc. #46, pp. 60-61.)


Dr. Burstein also conducted a peer-to-peer consultation with Dr. Stock, who stated to Dr. Burstein

> that he has not actually treated the claimant.
> Mr. Stock reported that he only saw the
> claimant on one occasion, in April, 2009. Mr.
> Stock stated that the claimant had difficulty
> performing the serial-seven and serial-three
> tasks, after consulting his file, but had no
> record of the claimant's actual responses. He
> indicated that he based his opinion that the
> claimant could not work on the claimant's
> history and the documentation but did not have
> any examples of the claimant's behavior or
> measurements of the claimant's cognitive
> functioning to support his opinion.

(Doc. #46, p. 62.)


Based upon his review of the submitted evidence and the peer-to-peer conference with Dr. Stock, Dr. Burstein opined that the evidence failed to support a finding of functional impairment, from a psychological perspective, for the entire period of September 25, 2008, through the date of his report (September 14, 2009). Dr. Burstein specifically found:

The claimant has not been in the care of a
mental health professional, or at least no
records were submitted from a mental health
professional. . . .

The submitted documentation indicates that the
claimant has been diagnosed with Parkinson's
disease.  This disease can cause impairments
in an individual's cognitive functioning.  It
is also a progressive disease that would be
expected to lead to increasing levels of
impairment over time.  However, as the
claimant's providers have not performed mental
status examinations or provided other findings
to corroborate that the claimant has had
impairments in his cognitive or emotional
functioning, it is impossible to determine
when, or if, the claimant's disease had caused
him to have symptoms that would have
interfered with his occupational functioning.
As recently as 04/09/09, the claimant was
exhibiting behaviors and mental status results
that were mostly within normal limits.  The
claimant was reported to not sit still,
although this could be a symptom of the
movement issues associated with Parkinson's
disease.  The claimant reportedly made errors
on the serial-seven task but Mr. Stock did not
indicate the claimant's responses, so it is
impossible to determine if the claimant made a
single error, which would not suggest that the
claimant was impaired to a degree that would
have interfered with his cognitive
functioning, or if the claimant made many
errors, which might have indicated impairments
in the claimant's ability to function.  There
were no measures of the claimant's psychomotor
speed to corroborate the claimant's complaints
that he could not work fast enough.
Therefore, the submitted documentation does
not support that the claimant was impaired,
from a psychological perspective, during the
period under review.

(Doc. #46, p. 63.)

Neurologist Dr. Vaughn Cohan, a medical consultant with Aetna, also completed a Physician Review in which he opined that evidence failed to support a finding of functional impairment for the entire period from September 25, 2008, through the date of his opinion. (Doc. #48, pp. 16-21.) In rendering this opinion, Dr. Cohan reviewed the same submitted records as reviewed by Dr. Burstein, and considered information obtained in peer-to-peer consultations he had with Drs. Silverman and Aton on September 14 and September 17, 2009, respectively. (_Id._ at pp. 16-17, 19.) Dr. Cohan reported Dr. Silverman to state that as of plaintiff's most recent visit with him in May 2009, there was no significant change in plaintiff's condition and that plaintiff could perform activities of daily living. Dr. Silverman stated that plaintiff had experienced a few episodes of transient and short-lived disorientation with full spontaneous resolution, and demonstrated mild rigidity and bradykinesia as well as minimal tremor. "Dr. Silverman stated that the claimant reported that he could not work intellectually, but Dr. Silverman noted the results of the claimant's previous neuropsychological evaluation by Dr. Schwarz [sic], which did not reveal any significant cognitive defect which would preclude performance of work." (_Id._ at p. 19.) With respect to Dr. Aton, Dr. Cohan reported him to state that plaintiff's cognitive functioning was very good and that plaintiff's primary problem was with tremulousness. Dr. Aton stated that he would

defer to neurology with respect to plaintiff's ability to work. (Id.)

Based upon his review of the submitted evidence and the peer-to-peer conferences with Drs. Silverman and Aton, Dr. Cohan opined that the evidence failed to support a finding of functional impairment for the entire period of September 25, 2008, through the date of his report (September 22, 2009). Dr. Cohan specifically found:

> The claimant left work in June 2008 with signs of Parkinsonism, and he was started on Sinemet therapy. The medical records reflect that the claimant's abnormal physical findings substantially improved while on Sinemet therapy. Although the claimant has reported cognitive problems as a reason for his alleged inability to work, nonetheless, the claimant's primary care physician has stated that no significant cognitive problems are noted, Dr. Silverman did not report any significant cognitive abnormalities on his examination, and a comprehensive neuropsychological evaluation found relatively normal cognitive functioning when performed by Dr. Schwarz [sic]. Dr. Tempel has stated that he considers the claimant to be cognitively impaired, and he makes reference to a psychological interview performed by Mr. Stock. I have previously opined that this evaluation would be inadequate with respect to evaluating the claimant's overall cognitive functionality for work for reasons stated above. It is my opinion that the documentation provided is not indicative of a functional impairment for the claimant's own occupation effective 9/25/08.

(Doc. #48, p. 20.)

On September 30, 2009, Aetna forwarded to Dr. Tempel a copy of Dr. Cohan's Physician Review and requested Dr. Tempel to indicate to Aetna the areas of the report with which he agreed and/or disagreed and to submit clinical evidence or documentation supporting his position. (Doc. #47, pp. 54-55.) In response, Dr. Tempel's office submitted a note stating, "Dr. Tempel cannot comment on his ability to work on 9/08 since he was not yet our patient. Dr. Tempel would recommend a neuropsych evaluation to see if he can cognitively hold a competitive underwriting job. We would be more than happy to order this testing if needed." (Id. at p. 56.)

In a letter dated November 13, 2009, Aetna informed plaintiff that, based on review of the submitted documentation, the peer-to-peer conferences with Drs. Silverman and Aton, and the October 2009 statement from Dr. Tempel, it had determined that there was a lack of medical evidence to support a finding that an impairment in plaintiff's physical and psychological functioning precluded him from performing the material duties of his own occupation as of September 25, 2008, and that the previous decision to terminate short term disability benefits was therefore upheld. Aetna advised plaintiff of the process by which to bring a civil action under ERISA to challenge the determination. (Doc. #46, pp. 30-32.)

C.   Post Administrative Appeal

On May 12, 2010, plaintiff, through counsel, submitted additional medical evidence to Aetna consisting of a neuro-psychological evaluation conducted by Dr. Kristen Sands on March 22, 2010.  Counsel argued to Aetna that such evaluation showed plaintiff's condition to continue to deteriorate.  Counsel also argued that plaintiff was denied the opportunity to obtain long term disability benefits because of Aetna's wrongful denial of short term disability benefits.  Plaintiff requested that Aetna reconsider its previous denial and cautioned that failure to do so would result in litigation by which both short term and long term disability benefits would be sought.  (Doc. #46, pp. 18-23.)

In a letter dated June 8, 2010, Aetna informed plaintiff that the appeal procedures under its policy had been fully exhausted and that its November 2009 decision to uphold the termination of plaintiff's short term disability benefits was not subject to further administrative review.  The medical documentation submitted with plaintiff's May 2010 letter was returned to counsel.  (Id. at pp. 16-17.)

This action followed.

### III.  Standard of Review

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court established the standard of review applicable to ERISA benefit claims.  In Firestone, the Court

determined that such claims are to be reviewed de novo unless the plan gives the "administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms" of the plan. Id. at 115. If the plan grants the administrator or fiduciary such discretionary authority, the court must determine whether the administrator abused its discretion in reaching its decision. See id.; see also Hackett v. Standard Ins. Co., 559 F.3d 825, 829-30 (8th Cir. 2009). Where, as here, a plan administrator plays a dual role under an employee benefits plan by acting as an evaluator of claims and a payer of benefits, a conflict of interest is created. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). Such conflict of interest must be weighed as a factor in determining whether the administrator abused its discretion; it does not convert the standard of review to one of de novo review. Id. at 115-16; Hackett, 559 F.3d at 830.

In reviewing for abuse of discretion, the court must affirm the plan administrator's action under the plan unless it is arbitrary and capricious. Manning v. American Republic Ins. Co., 604 F.3d 1030, 1038 (8th Cir. 2010). To determine whether a plan administrator's decision was arbitrary and capricious, the court examines whether the decision was reasonable. Id. Any reasonable decision will stand, even if the court would have determined the matter differently as an original matter. Id. "[T]his standard does not apply[, however,] if the plan administrator has committed

'a serious procedural irregularity' causing 'a serious breach of the plan administrator's fiduciary duty to the claimant,' in which case the court applies a less deferential standard of review." <u>Id.</u> (quoting <u>Pralutsky v. Metropolitan Life Ins. Co.</u>, 435 F.3d 833, 837 (8th Cir. 2006)).

In his Amended Complaint and Motion for Summary Judgment, plaintiff claims that Aetna committed serious procedural irregularities causing a serious breach of its fiduciary duty to plaintiff, and thus that the less deferential standard of review applies. For the following reasons, plaintiff's argument fails.

Plaintiff claims that defendants' failure to consider his eligibility for Social Security benefits constitutes a procedural irregularity warranting less than deferential review. As an initial matter, the undersigned notes that "ERISA plans are not bound by Social Security determinations," and courts owe no deference to findings made under the Social Security Act. <u>Ciulla v. Usable Life</u>, 864 F. Supp. 883, 888 (W.D. Ark. 1994) (cited approvingly in <u>Coker v. Metropolitan Life Ins. Co.</u>, 281 F.3d 793, 798 (8th Cir. 2002)). Nevertheless, other than his eligibility for Social Security benefits, plaintiff presents no evidence demonstrating that the failure to consider such eligibility affected Aetna's decision to terminate and/or deny plan benefits. Plaintiff does not identify any records considered by the Social Security Administration which should have been, but were not,

considered by Aetna. The mere assertion of a perceived irregularity, without more, is insufficient to give rise to heightened review. <u>Kesco v. Meredith Corp.</u>, 480 F.3d 849, 852 (8th Cir. 2007). "Absent material, probative evidence, beyond the mere fact of the apparent irregularity, tending to show that the administrator breached his fiduciary obligation," the traditional abuse of discretion analysis will be applied. <u>Id.</u> at 852-53 (internal quotation marks and citation omitted). Because plaintiff fails to present evidence of a connection between Aetna's failure to consider his eligibility for Social Security benefits and Aetna's denial of plan benefits, a less-than-deferential standard of review is not warranted. <u>Id.</u> at 853; <u>see also</u> <u>Chronister v. Baptist Health</u>, 442 F.3d 648, 655 (8th Cir. 2006).

Plaintiff also claims that defendants' failure to refer him for an independent psychological, physical and/or vocational examination constituted a procedural irregularity. Under its disability plans, however, Aetna was not required to order independent examinations or evaluations (<u>see</u> Doc. #41-4, p. 10; #41-6, p. 10), and "case law contains no such absolute requirement." <u>Torres v. UNUM Life Ins. Co. of Am.</u>, 405 F.3d 670, 678 (8th Cir. 2005). This perceived irregularity does not subject Aetna's decision to terminate benefits to less than deferential review. <u>Id.</u> at 678, 679-80.

Plaintiff contends that defendants effected the

termination of his short term disability benefits so as to prevent plaintiff from becoming eligible for long term disability benefits.[7]   Plaintiff presents no evidence to support this assertion.   "Absent material, probative evidence, beyond the mere fact of the apparent irregularity, tending to show that the administrator breached his fiduciary obligation, we will apply the traditional abuse of discretion analysis."   <u>Kesco</u>, 480 F.3d at 852-53 (internal quotation marks and citation omitted).

Plaintiff also argues that procedural irregularities exist in the manner by which defendants reviewed the evidence submitted in support of his disability.   Specifically, plaintiff claims that defendants failed to consider the report of Dr. Stock's March 2009 evaluation, submitted to them in July 2009; and made their determination to terminate benefits without competent, objective evidence of improvement in plaintiff's health.   With respect to plaintiff's claim regarding defendants' treatment of Dr. Stock's evaluation, his claim is without merit.   Contrary to plaintiff's assertion, Dr. Stock's evaluation was reviewed by Aetna and its medical consultants, and was summarized and analyzed in Aetna's decision to uphold its previous termination of benefits. Indeed, Aetna consultant Dr. Burstein conducted a peer-to-peer conference with Dr. Stock——during which Dr. Stock's evaluation was

---

[7]Under Aetna's LTD Plan, an employee does not become eligible for receipt of long term benefits until after the first 180 days of a period of disability.  (Doc. #41-5, p. 6; #41-6, p. 2.)

discussed—and reported his conclusions resulting therefrom in his Physician Review. To the extent plaintiff claims procedural irregularity in the termination of benefits without objective evidence of medical improvement, such argument is directed more to the reasonableness of the administrator's decision based on the evidence presented rather than a serious irregularity in the process, that is, an irregularity "so severe that the court 'has a total lack of faith in the integrity of the decision making process.'" <u>Pralutsky</u>, 435 F.3d at 838 (quoting <u>Buttram v. Central States, Se. & Sw. Areas Health & Welfare Fund</u>, 76 F.3d 896, 900 (8th Cir. 1996)). The normal standard of review is thus appropriate. <u>Id.</u>

Plaintiff appears to also argue that Countrywide's letter to him dated September 19, 2008, terminating his employment "based on [his] permanent disability" (Doc. #55-2, p. 27) constitutes his employer's finding that he could not perform the duties of his job and demonstrates the incongruity of Aetna's ultimate determination that plaintiff was not so disabled. A review of the letter <u>in toto</u>, however, shows that Countrywide did not act on its own determination that plaintiff was permanently disabled, but rather on plaintiff's representation: "Dear Mr. Kennedy: As a follow-up to our conversation on September 19, 2008, *you have advised* that you will not be able to return to work due to your permanent disability." (<u>Id.</u>, emphasis added.) No serious procedural

irregularity in Aetna's actions is demonstrated by the contents of Countrywide's letter terminating plaintiff's employment.

Plaintiff also contends that defendants engaged in procedural irregularities by not providing the complete claims file to him until September 3, 2009. Plaintiff argues that without a more timely provision of the file, he was unable to counter Dr. Spira's report and substantiate his claim on administrative appeal inasmuch as he did not previously see the report. A review of the record counters this assertion. Indeed, in his March 2009 letter to Aetna appealing the initial adverse decision, plaintiff, through counsel, refers extensively to Dr. Spira's Physician Review report, identifying the report to be among "documents that you sent to him[.]" (Doc. #46, pp. 46-47.)

Finally, plaintiff claims that defendants improperly obtained opinions from Aetna consultants Drs. Burstein and Cohan after the appeal process had closed without providing plaintiff an opportunity to review and rebut such opinions. "[T]he full and fair review to which a claimant is entitled under 29 U.S.C. § 1133(2) does not include reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers solicited on that same level of appeal." Midgett v. Washington Group Int'l Long Term Disabilty Plan, 561 F.3d at 896. Instead, the applicable regulations state that a claimant "[is] entitled to access those peer reviews *only after* [the administrator] ma[kes] its 'adverse

benefit determination on review.'" Id. at 895 (quoting 29 C.F.R. § 2560.503-1(i)(5)) (emphasis added). To the extent plaintiff claims that defendants improperly padded the claims file by obtaining these opinions, regardless of his lack of opportunity to review and rebut them, a review of the regulations shows that in the circumstances of plaintiff's administrative appeal here, Aetna was *required* to procure such peer reviews:

> [I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary *shall* consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment[.]

29 C.F.R. § 2560.503-1(h)(3)(iii) (emphasis added).

Further, as noted by the Eighth Circuit in Midgett, § 2560.503-1(h)(3)(iii) does not require a claimant to be given the opportunity to review and rebut such health care professional's conclusion. Midgett, 561 F.3d at 895. Lastly, to the extent plaintiff asserts a procedural irregularity on account of defendants' failure to identify Drs. Burstein and Cohan until the instant litigation, nothing in the applicable regulations requires a plan administrator to sua sponte provide to a claimant the specific identity of its peer reviewers or their credentials after an adverse administrative review. See Midgett, 561 F.3d at 896; 29 C.F.R. § 2560.503-1(j). Although plaintiff was entitled to

receive, upon request, copies of all documents, records and information relevant to his claim on review, 29 C.F.R. § 2560.503-1(j)(3), nothing before the Court shows that plaintiff made such request until the instant litigation. No procedural irregularity exists with respect to defendants' procurement of Drs. Burstein's and Cohan's opinions, nor with respect to their disclosure thereof.[8]

Accordingly, for all of the foregoing reasons, the Court will review the plan administrator's decision to terminate and/or deny plan benefits for abuse of discretion, taking Aetna's financial conflict of interest into consideration.

## IV. Discussion

In reviewing for an abuse of discretion, the plan administrator's decision should be reversed only if it is arbitrary and capricious. Green v. Union Sec. Ins. Co., 646 F.3d 1042, 1050 (8th Cir. 2011); Midgett, 561 F.3d at 896. To determine whether a plan administrator's decision was arbitrary and capricious, the Court must look to whether the decision to deny benefits was supported by substantial evidence, "meaning more than a scintilla but less than a preponderance." Midgett, 561 F.3d 897 (internal quotation marks and citation omitted). The Court should not

---

[8]In his briefs on the instant motions for summary judgment, plaintiff repeatedly requests the Court to strike the opinions of Drs. Burstein and Cohan on account of these alleged procedural irregularities. For the reasons stated herein, the Court will not strike these opinions.

disturb the decision if it is supported by a reasonable explanation, even though a different reasonable interpretation could have been made. Id. "[A] decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." Id. (internal quotation marks and citations omitted) (emphasis in original). For the following reasons, Aetna's decisions here were reasonable and supported by substantial evidence. In addition, because the circumstances do not suggest a higher likelihood that Aetna's conflict of interest affected its benefits decision, this factor does not weigh heavily in this Court's evaluation for abuse of discretion. See Green, 646 F.3d at 1053-54.

During initial review, Aetna had before it medical evidence which lacked any objective findings that plaintiff suffered cognitive deficits on account of his condition. Other than plaintiff's subjective statements during examinations that he experienced cognitive slowing, plaintiff's providers made no contemporaneous clinical findings of such slowing and, indeed, mental status examinations were consistently within normal limits. In addition, during the peer-to-peer conference conducted in September 2008, it was noted that plaintiff's treating neurologist "could not describe anything clinical on examination that would preclude [plaintiff] from working in his own occupation[.]" (Doc.

#47, p. 10.)  It was also noted during this initial review that plaintiff's condition improved with medication, and medical evidence submitted in support of plaintiff's application for benefits supported this finding.  To the extent plaintiff's treating neurologist and treating internist opined in their respective APS's that plaintiff's condition rendered him unable to work, Aetna's consulting neurologist found that such restrictions were not supported by the medical data provided.  In light of the substantial evidence demonstrating medical improvement and lack of cognitive deficit, coupled with conflicting medical opinions regarding the extent of plaintiff's limitations, it was not unreasonable for Aetna, as plan administrator, to determine the evidence not to support a finding that plaintiff was unable to perform his job duties.  See Midgett, 561 F.3d at 897-98.  "Where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion is finding the employee not to be disabled."  Id. at 898 (internal quotation marks and citation omitted).  This is so even where, as here, the conflict in opinions exists only between the consulting peer reviewer and a claimant's treating physician(s).  See id. at 897 (and cases cited therein); Pralutsky, 435 F.3d at 835-37.  Accordingly, on initial review, the decision to terminate plaintiff's short term disability benefits was not arbitrary and capricious and therefore did not constitute an abuse of discretion.  Midgett, 561 F.3d at 898.

The same holds true for the adverse determination on administrative appeal. During its review of the decision to terminate benefits, Aetna had before it the same evidence submitted on initial determination as well as additional evidence submitted on appeal by plaintiff, plaintiff's physicians, and consulting peer review physicians. In its written decision denying plaintiff's appeal, Aetna specifically and thoroughly summarized the medical evidence submitted on appeal, including the medical evidence on plaintiff's initial application, Dr. Stock's March 2009 evaluation, Dr. Tempel's June 2009 evaluation, and the neuropsychological evaluation conducted in October 2008 by Dr. Schwarze. The written decision also summarized the peer-to-peer conference conducted with Dr. Silverman, plaintiff's treating neurologist, wherein Dr. Silverman stated that, as of May 2009, plaintiff's condition had not changed; plaintiff could perform activities of daily living; and that plaintiff had experienced few transient episodes of disorientation that were short-lived and spontaneously resolved. With respect to plaintiff's intellectual ability to work, it was noted that Dr. Silverman referenced Dr. Schwarze's neuro-psychological evaluation which did not reveal any significant cognitive defect which would preclude performance at work. The peer-to-peer conference with Dr. Aton was also summarized wherein Dr. Aton described plaintiff's cognitive functioning as "pretty good"; opined that plaintiff's primary problem was with

tremulousness; and reported that he would defer to neurology with respect to plaintiff's ability to work. Finally, the written decision referred to Dr. Tempel's October 2009 note wherein it was stated that Dr. Tempel could not provide an opinion on plaintiff's ability to work in September 2008 inasmuch as plaintiff was not Dr. Tempel's patient at that time. (Doc. #46, pp. 30-32.)

With respect to Dr. Stock's evaluation, Aetna's decision noted that Dr. Stock did not describe any detailed examination of plaintiff's memory function despite plaintiff's subjective complaint of memory impairment, and that plaintiff's mental status examination was otherwise intact. The decision also noted that despite plaintiff's subjective complaints of depression and anxiety, Dr. Stock did not conduct any standardized tests or measure plaintiff's consistency, reliability or effort. In light of these circumstances, Aetna determined that Dr. Stock's examination did "not qualify as a comprehensive and reliable measurement of Mr. Kennedy's neurocognitive functioning." (Doc. #46, p. 31.) With respect to Dr. Tempel's evaluation, Aetna's written decision noted Dr. Tempel to agree with Dr. Stock's conclusion regarding plaintiff's ability to work. However, Aetna's decision also set out Dr. Tempel's recorded findings of intact mental status examination, intact nerve functioning and sensory examination, normal strength, mild rigidity and mild bradykinesia, no involuntary movements, and mild tremor with outstretched arms.

(Id.)

Against this backdrop, coupled with the other evidence submitted to and reviewed by Aetna, substantial evidence supports Aetna's decision to affirm its initial decision to terminate plaintiff's short term disability benefits effective September 25, 2008. The peer reviewers on appeal concluded that the evidence did not support a finding that plaintiff was functionally impaired to perform the duties of his work, and indeed the information provided by plaintiff's treating physicians to the peer reviewers demonstrated that plaintiff's cognitive abilities did not preclude the performance of his work. In addition to these peer reviews, treatment records showed plaintiff's physical abilities to be only mildly impaired. Finally, Dr. Stock's single evaluation of plaintiff employed no comprehensive testing or other measurement of plaintiff's abilities but instead relied on plaintiff's subjective reports and his review of limited medical and lay evidence provided by plaintiff. Likewise, Dr. Tempel's conclusion was based on Dr. Stock's evaluation, which was properly discredited by Aetna. In contrast, Dr. Schwarze administered multiple diagnostic tests and comprehensive evaluations thereof, from which she determined that plaintiff was not precluded from performing the demands of work.

In light of the conflicting medical opinions in this case, Aetna's continued denial of plaintiff's disability claim was not arbitrary and capricious. Midgett, 561 F.3d at 898; see also

Coker, 281 F.3d at 799 (denial of benefits not unreasonable where subjective medical opinions were not supported by objective medical evidence, and objective medical evidence showed no disabling medical condition). Indeed, in view of Dr. Schwarze's comprehensive neuropsychological examination, the peer review reports, and the treating physicians' statements made during the peer-to-peer conferences describing plaintiff's actual cognitive and physical abilities, a reasonable person could have reached a similar decision. Midgett, 561 F.3d at 897. Aetna therefore did not abuse its discretion in its decision to affirm the termination of plaintiff's short term disability benefits. Id. at 898.

To the extent plaintiff claims that Aetna abused its discretion by failing to accord appropriate weight to the opinions of treating and/or examining physicians Drs. Silverman, Aton, Stock, and Tempel, and instead improperly determined to credit and rely upon the opinions of non-examining, consulting peer review physicians, the Eighth Circuit recently noted that

> [t]he Supreme Court has recognized that treating physicians are not automatically entitled to special weight in disability determinations under ERISA:
>
> > Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts

> impose on plan administrators a discrete
> burden of explanation when they credit
> reliable evidence that conflicts with a
> treating physician's evaluation.

Midgett, 561 F.3d at 897 (quoting Black & Decker Disability Plan v.
Nord, 538 U.S. 822, 834 (2003)).

Because the record supports Aetna's denial of benefits to
plaintiff, Aetna's acceptance of the peer reviewers' opinions over
those of plaintiff's treating physicians was not an abuse of
discretion. Id.

Plaintiff also claims that the defendants abused their
discretion by picking and choosing what evidence upon which to rely
in making their adverse determination. Plaintiff avers that such
selective reference is evidenced by defendants' failure to
acknowledge plaintiff's specific job description in the final
decision, their failure to set out how plaintiff could perform his
job with his impairments, and their failure to acknowledge Mr.
Cunningham's resume and professional opinion regarding plaintiff's
ability to perform the job of underwriter III. The evidence and
information reviewed by Aetna in making its final decision included
the evidence described by plaintiff above. In its final
determination on appellate review, however, Aetna was not required
to discuss the specific evidence submitted by plaintiff. Midgett,
561 F.3d at 896 (citing 29 C.F.R. § 2560.503-1(j)). As such, the
failure of Aetna to discuss the specific details of plaintiff's job
description and the letter and resume submitted by Mr. Cunningham

does not detract from the reasonableness of Aetna's determination to deny plaintiff disability benefits.

Finally, because plaintiff's disability status terminated effective September 25, 2008, plaintiff did not meet the 180-day elimination period of continuous disability in order to become eligible for long term disability benefits. The decision to deny plaintiff long term disability benefits on account of his inability to meet the Plan's required elimination period was reasonable. Butts v. Continential Cas. Co., 357 F.3d 835, 839 (8th Cir. 2004).

As noted above, the plan administrator here, Aetna, plays a dual role under the relevant employee benefits plans by acting as an evaluator of claims and a payer of benefits, thereby creating a conflict of interest which must be considered by the Court. A review of the evidence shows, however, that Aetna has taken active steps to reduce potential bias and to promote accuracy in its decision making, including, *inter alia*, the walling off of claims administrators from those interested in firm finances, a quality assurance program intended to assess the accuracy of claims decisions, and an employee evaluation process based on the quality of claims decisions rather than on the amount or number of claims paid or denied. (Doc. #41-1, Bryant Decl.) In addition, plaintiff has presented no evidence demonstrating that Aetna has a history of biased claims decisions. Accordingly, this structural conflict of interest, albeit a factor to be considered in determining whether

Aetna abused its discretion, is given little weight.  See Green,
646 F.3d at 1053 (citing Glenn, 554 U.S. at 117).

For all of the foregoing reasons, there was substantial
evidence to support Aetna's decision to terminate plaintiff's short
term disability benefits effective September 25, 2008, and to deny
plaintiff's request for long term disability benefits.  As such,
Aetna did not abuse its discretion in its determinations.  In
addition, because Aetna provided a reasonable explanation for its
decisions, the decisions should not be disturbed.  Midgett, 561
F.3d at 897.

## V. Newly Submitted Evidence

Plaintiff requests the Court to consider the
neuropsychological report completed by Dr. Kristen Sands in March
2010 as evidence to support his claim that he is entitled to
disability benefits under defendants' SDT and LTD Plans.
Defendants oppose the consideration of such evidence.

"When reviewing a denial of benefits by an administrator
who has discretion under an ERISA-regulated plan, a reviewing court
'must focus on the evidence available to the plan administrators at
the time of their decision and may not admit new evidence or
consider *post hoc* rationales.'"  King v. Hartford Life & Accident
Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005) (quoting Conley v.
Pitney Bowes, 176 F.3d 1044, 1049 (8th Cir. 1999)).  Evidence of
Dr. Sands' evaluation, which was conducted in March 2010, was not

available to Aetna in November 2009 when it made its final decision on review to affirm its previous termination of plaintiff's short term disability benefits.  In light of the standard set out in <u>King</u>, the Court must deny plaintiff's request to submit after-acquired evidence in an effort to prove his claim.[9]

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that defendants Aetna Life Insurance Company and Countrywide Financial Corporation's Motion for Summary Judgment (Doc. #40) is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiff Geoffrey L. Kennedy's Motion for Summary Judgment (Doc. #51) is **DENIED.**

Judgment shall be entered accordingly.


*Frederick R. Buckles*

UNITED STATES MAGISTRATE JUDGE


Dated this _22nd_ day of May, 2012.

---

[9]Even in a case subject to <u>de novo</u> review, the Court may not consider such evidence unless good cause is shown to depart from this general rule.  <u>Conley v. Pitney Bowes</u>, 176 F.3d 1044, 1049 (8th Cir. 1999).  Plaintiff's argument that this evidence demonstrates his inability to work does not constitute good cause. <u>Cf.</u> <u>Davidson v. Prudential Ins. Co. of Am.</u>, 953 F.2d 1093, 1095 (8th Cir. 1992) ("Davidson's offer of additional evidence at this point amounts to nothing more than a last-gasp attempt to quarrel with Prudential's determination that he is capable of gainful employment.").